Gary JARRETT, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4065.

Supreme Court of Wyoming.

Sept. 11, 1972.

Donald E. Chapin, of Crowell & Chapin, Casper, for appellant.

Clarence A. Brimmer, Atty. Gen., William M. Sutton, Special Asst. Atty. Gen., Cheyenne, John Burk, County & Pros. Atty., and Jerry A. Yaap, Deputy County & Pros. Atty., Casper, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN, and GUTHRIE, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Gary Jarrett, at the time between sixteen and seventeen years of age, was charged with the January 26, 1968, first degree murder of his sister, Janine, one year younger than he. At his arraignment, where he was represented by counsel, he pleaded not guilty, not guilty by reason of insanity at the time of the alleged offense, and not triable by reason of present insanity. On January 31, 1968, he was committed to the Wyoming State Hospital for observation and examination and retained there for some two and one-half years when the superintendent of that institution advised that "Pursuant to Section 7–271 et seq., Wyoming Statutes 1957 as amended, * * * the above named defendant [Gary L. Jarrett] has been found by the staff of this Hospital to be able to stand trial." His hearing before a jury, beginning July 19, 1971, resulted in a verdict of guilty of first degree murder, without capital punishment, and that he was sane at the time of the commission of the offense, from which verdict and subsequent judgment the cause has been appealed on the following grounds:

(a) The court erred in admitting the March 18, 1968, letter of Dr. William N. Karn (Superintendent of the Wyoming State Hospital) introduced by the prosecution.

(b) The statement given by the defendant to the Casper police within hours of the death of his sister was not voluntarily made and should not have been received by the court.

(c) The court erred in refusing to grant defendant's motion for judgment of acquittal at the close of all the evidence, because

the evidence submitted by both parties did not as a matter of law establish beyond all reasonable doubt the sanity of the defendant.

Although a discussion of the case might be more meaningful if prefaced by a complete account of the occurrences immediately prior to Janine Jarrett's death, defendant has challenged the propriety of his statement concerning such circumstances made by him to the police shortly after the tragedy but does not challenge the report of his personal history and mental status examination, conducted by Dr. Jack Tedrow, psychiatric consultant at the state hospital and a witness for defendant at the trial, and perhaps excerpts from this report will suffice to furnish background for our discussion:[1]

> "* * * He [defendant] plotted his sister's murder off and on since September, 1967. At the time he used a pistol, placing it to her head. He did it in the morning when she came out of the bathroom in preparation for going to school. He only fired once, then he put the gun under her hand. * * * He used rubber gloves when he committed the murder with the idea of not having his fingerprints available. Subject bought these about Christmas time in order to kill his sister. Yet, at that time he was thinking more in terms of stabbing her, but decided this would not be sufficiently humane. * * *"

### Admission of the Karn Letter

▇▇ It is complained that during the State's cross-examination of Dr. William Pace, Associate Superintendent at the Wyoming State Hospital at Evanston, called as a witness for defendant, the State offered a letter written March 18, 1968—

some two years before the trial—by the hospital's superintendent, Dr. Karn. More definitively it is said that: "A portion of the letter indicated that, although the patient was medically psychotic and had been so for years * * *, Dr. Karn at that time believed appellant sane, and that at that time he believed appellant had been legally sane at the time the act was committed under his then understanding of the legal standards for determination of the question of insanity. This letter was admitted over appellant's objection * * * and despite the fact that Dr. Karn was the Supervisor of the State Hospital in Evanston at the time of the trial and was available to testify." Defendant then goes on to define hearsay, to discuss certain. exceptions, and to insist both that Dr. Karn was available to the State and that the hearsay was admitted with no foundation in violation of defendant's right under the Sixth Amendment of the United States Constitution to be confronted with the witnesses against him.[2] He disregards or at least leaves out of consideration the fact that Dr. Pace, in reaching the conclusions he expressed as to the mental condition of defendant on the day of the murder, and testifying over the objection of the State on the ground of hearsay, specifically indicated his reliance upon the records of the Wyoming State Hospital compiled during the period from the date of defendant's first admittance.[3] Such records consisted of reports of the psychiatrist and physicians who had examined defendant, neurological consultations and psychological testing, social history, laboratory work, physicians' progress notes, nurses' notes, and correspondence regarding his situation from the time of his arrival. Dr. Karn's letter here in issue was the original report of the Wyoming State Hospital to the

---

1. After Dr. Tedrow had testified at the instance of defendant, the personal history and mental status examination was introduced in evidence without objection.

2. Although it was suggested in oral argument that the Karn letter (stating, inter alia, "[defendant] is legally sane according to the McNaghten [sic] formula, because he knew the nature, quality and consequences of his act and he knew what he was doing was wrong") improperly presented a conclusion as to sanity, which was the prerogative of the jury, there was no such objection interposed at the trial.

3. Dr. Pace did not examine the defendant until November 10, 1970.

court on defendant's mental condition, a part of the records of the hospital on which Dr. Pace professed to have based his opinion, and was admissible under the Uniform Business Records as Evidence Act.[4] Morton v. Reynolds, Wyo., 428 P.2d 725, 731. In this context the letter was not hearsay evidence at all and authorities submitted on that subject are not germane. Even if we did not so consider and were to assume, arguendo, the hospital records to be hearsay and admitted by the trial court as an exception because the doctor's testimony was an "institutional opinion," courts will not permit a device of this nature to be used as a method of stifling cross-examination. Vinicky v. Midland Mutual Cas. Ins. Co., 35 Wis.2d 246, 151 N.W.2d 77, 83.[5] For these reasons, the contention of error because Dr. Karn's letter was admitted and because Dr. Pace was cross-examined regarding the contents thereof has no validity.

 Defendant also argues that the trial court was inconsistent in allowing hearsay testimony of Dr. Karn's letter and sustaining an objection to a question asked Dr. Pace as to Dr. Karn's opinion. We have previously indicated the letter was not hearsay. Very different was the attempted presentation of Dr. Karn's reaction to Dr. Pace's conclusions by way of the statement sought from Dr. Pace—most clearly hearsay. Accordingly, there was no inconsistency.

*Admission of Defendant's Statement to Casper Police*

 Defendant asserts, citing Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L. Ed.2d 246, that voluntariness is to be determined from the totality of the surrounding circumstances, a rule which we tacitly recognized recently in Lonquest v. State, Wyo., 495 P.2d 575, where we observed at 582 that the voluntariness of a confession is necessarily a question which must be determined on the facts of each case as they arise. He correctly says that under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, the admissibility of a confession depends upon the defendant's being advised of his rights and intelligently waiving them, and impliedly concedes that here the warning indicated by Miranda as being proper was given and would be sufficient except that the two psychiatrists' testimony, the finding of incompetency to stand trial after the shooting, and the lay-witness testimony as to defendant's behavior prior to the killing "seem to indicate a strong possibility" that defendant was insane and incompetent at the time he confessed. In that connection he discusses Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242, at some length, as well as United States v. Silva, 2 Cir., 418 F.2d 328.

Defendant's argument on this aspect of the case does not bear scrutiny: First, because in the present case the jury determined that the defendant at the time of the offense was sane—thus, if it be contended that the same rule should apply, defendant must be taken as having been sane at the time of the confession and it was accordingly voluntary. Further, the situation here and in Blackburn, supra, were not at all similar, there the evidence being very strong that the defendant was insane at the time of the confession and additionally that there had been an extensive eight or nine-hour inquisition. Equally incomparable is the Silva case, supra, where there was substantial evidence of earlier insanity of defendant, including attempts to commit suicide, previous treatment at hospitals for

4. Sections 1–170 to 1–173, W.S.1957.

5. The State cites 29 Am.Jur.2d Evidence § 839; Snyder v. Lincoln, 153 Neb. 611, 45 N.W.2d 749, for the principle that if one party is permitted to introduce part of a writing his opponent may prove the remainder. While the philosophy of this rule might under some concept be persuasive in the instant case, for reasons expressed in the opinion, we find it unnecessary to consider its application.

psychiatric disorders, the use by him of heroin, and extended and repeated attempts of the officers to secure a confession from him.

■ Counsel in the brief says that the confession cannot be considered voluntary because when police officers arrived at the hospital one asked Jarrett and his mother what had happened or who had shot the person, defendant answered, "Well, I guess I did, it's sort of difficult," and that defendant thereafter felt compelled to make a further statement, having already implicated himself. That such circumstances would have any bearing on the voluntariness of the confession is unsupported by either authority or cogent argument.

■ We do not overlook the averments here that the time of the statement was soon after the sister's death; defendant had had no prior experience with police officers; and no relative, friend, or counsel was present. These circumstances do not ipso facto render the confession involuntary or inadmissible, and we find nothing in the record tending to show that they had any bearing on what was said by defendant to the officer. On the contrary are numerous circumstances reflected by the evidence that would reasonably show the statement to be both voluntary and to have been given by one who was sane and fully aware of the wrongfulness of the shooting. His statement, among other things, showed that he had planned more than one method of killing his sister and was concerned in making himself look "lily white." He evaluated and compared different methods of effectuating the killing, which he had contemplated for some time, and had worn rubber gloves in order to conceal the fingerprints and to leave the impression that the sister had committed

suicide. His speaking of having "chickened out" on one occasion indicates as does the entire account of what happened that the statement was made without coercion, voluntarily, by an intelligent person who well knew the difference between right and wrong, albeit he had some warped ideas.[6]

A careful examination of all the evidence adduced at the trial discloses no circumstance sufficient to show either that the confession was involuntary or given by a person who was at the time insane to the point of not knowing what he was doing.

### Denial of Motion for Acquittal

■ Defendant's contention of the court's error in not granting his motion for acquittal seems to be predicated largely on the testimony of Drs. Pace and Tedrow that he was suffering from schizophrenia, paranoid type, and unable to form the necessary intent to be accountable for his acts, urging further that this view of the two mentioned doctors was fully corroborated by the lay testimony introduced in the state's rebuttal. Such approach accords no weight to the circumstance that the opinions of Drs. Pace and Tedrow were inconsistent with that expressed by Dr. Karn in the March 18, 1968, letter and that neither of them had any contact with the defendant at or immediately after the shooting, both of them basing their testimony on the records of the hospital, the statements made to them by the defendant, and the examinations they made of him after the critical period. Each of these doctors when questioned was clear in his statement that defendant on January 26, 1968, knew that his act of shooting was wrong and unlawful. Moreover, we do not interpret the testimony of Jarrett's teachers, who had been in close contact with him at school

---

6. Defendant lists as a factor to be considered in determining the admissibility of his statement "the administering of a sedative" before it was made. However, he does not delineate this objection either factually or by argument and the record merely shows a concession by the officer

taking the statement that defendant told him a sedative had previously been administered to him at the hospital. There is no indication of its nature or even the time it had been given. We cannot assume that this was any interference with the voluntariness of the confession.

prior to the time of the crime, as corroborating all aspects of the testimony of Drs. Pace and Tedrow. In fine, there was testimony which the jury was entitled to believe showing that while the defendant may have suffered from a mental disease or disorder he knew and understood the nature and probable consequences of his act, knew that it was morally wrong or forbidden by law, and had sufficient will power to control his acts. Thus, the trial court correctly denied the motion for acquittal.

Affirmed.